# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Nos. 1D17-4024
1D17-4025
1D17-4102
(Consolidated for disposition)

_____

FLORIDA ASSOCIATION OF HOMES
AND SERVICES FOR THE AGING,
INC. d/b/a LEADINGAGE FLORIDA,

    Petitioner,

    v.

AGENCY FOR HEALTH CARE
ADMINISTRATION, DEPARTMENT
OF ELDER AFFAIRS,

    Respondents.

_____

A Petition to Review Non-Final Agency Action – Original Jurisdiction

July 25, 2018

M.K. THOMAS, J.

Petitioners, in these consolidated cases, seek review of Emergency Rules 58AER17-1, Procedures Regarding Emergency Environmental Control for Assisted Living Facilities, and 59AER17-1, Nursing Home Emergency Power Plan. Petitioners contend that the findings of immediate danger, necessity, and procedural fairness on which the rules are based are insufficient

under section 120.54(4), Florida Statutes (2017). The petitions for review are denied because we find that the agencies have presented a sufficient factual basis that an immediate danger to the public health, safety, or welfare existed.

We have jurisdiction pursuant to section 120.54(4)(a)3., Florida Statutes. *See also Little v. Coler*, 557 So. 2d 157, 158 (Fla. 1st DCA 1990). The petitions at issue were previously denied by emergency order, which advised that a substantive opinion would be forthcoming. We write now to provide this Court's reasoning. The petitions are denied because this Court's review is limited to inspection of the four corners of the emergency rules, which sufficiently set forth the immediate danger to the public safety or welfare the rules were designed to address.

Section 120.54(4)(a) provides an agency with the authority to adopt an emergency rule if it "finds that an immediate danger to the public health, safety, or welfare requires emergency action," and such rule is "necessitated by the immediate danger." The agency may adopt an emergency rule by any procedure, which is fair under the circumstances, so long as: (1) the procedure provides a minimum amount of procedural protection; (2) the agency takes only that action necessary to protect the public interest; and (3) the agency publishes, in writing, the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare and its reasons for concluding the procedure used is fair under the circumstances. *Id.* "In order to utilize emergency rulemaking procedures, rather than employing standard rulemaking, an agency must express reasons at the time of promulgation of the rule for finding a genuine emergency." *Fla. Health Care Ass'n v. Agency for Health Care Admin.*, 734 So. 2d 1052, 1053 (Fla. 1st DCA 1998).

Because the emergency rulemaking procedures do not afford parties either the full panoply of due process protections or the protections of economic impact analyses as required by the regular rulemaking process, the agencies must strictly adhere to the requirements set forth in section 120.54 when adopting emergency rules. *See Krajenta v. Div. of Workers' Comp., Dep't of Labor and Emp't Sec.*, 376 So. 2d 1200, 1202 (Fla. 2d DCA 1979) (noting courts have not been hesitant to strike down emergency rules that

2

were not adopted in strict compliance with the statute). "The courts generally do not concern themselves with the substantive validity of the emergency rule. Instead, the concern is whether the agency followed the requirements of section 120.54(4)(a)." *Fla. Democratic Party v. Hood*, 884 So. 2d 1148, 1151 (Fla. 1st DCA 2004) (internal citation omitted).

As stated above, section 120.54(4)(a) requires the agencies to set forth the reasons, in writing, both for the finding that an emergency exists and to explain why the procedure utilized to adopt the rule is fair. On review, this Court looks only to the reasons set forth by the agency as the basis for adopting the rule to determine its validity. *Hood*, 884 So. 2d at 1153. It is not this Court's responsibility to determine whether other means may have been more appropriate. *Id.*

Additionally, because of the accelerated emergency rulemaking process, our review occurs prior to any hearings or rulings below. Thus, the record on appeal is limited to the four corners of the emergency rules themselves. *See* § 120.68(4), Fla. Stat.; *Pinacoteca Corp. v. Dep't of Bus. Regulation, Div. of Alcoholic Beverages and Tobacco*, 580 So. 2d 881, 882 (Fla. 4th DCA 1991); *Commercial Consultants Corp. v. Dep't of Bus. Regulation, Div. of Fla. Land Sales and Condos.*, 363 So. 2d 1162, 1164 (Fla. 1st DCA 1978). Therefore, this Court must determine whether the four corners of the emergency rules sufficiently identify particularized facts showing an immediate danger to the public welfare. *Denney v. Conner*, 462 So. 2d 534, 535-36 (Fla. 1st DCA 1985).

Here, the emergency rules at issue, as introduced in the Florida Administrative Register, include almost identical statements setting forth the specific reasons for finding an immediate danger to the public health, safety, or welfare:

The State has experienced extreme shortages of electrical power that have jeopardized, and continue to jeopardize, the health, safety, and welfare of residents in Florida's [regulated facilities]. According to the United States Census Bureau, Florida has the largest percentage of residents age 65 and older in the nation. According to the Centers for Disease Control and Prevention, people age

3

65 years or older are more prone to heat-related health problems. An incompetent response by a nursing facility to a loss of air conditioning after Hurricane Irma resulted in the tragic loss of eight senior citizens at the Rehabilitation Center at Hollywood Hills. Thousands of frail seniors reside in [regulated facilities] in Florida. Ensuring that [regulated facilities] maintain sufficient resources to provide alternative power sources during emergency situations mitigates the concerns related to the health, safety, and welfare of residents in those [regulated facilities] that experience loss of electrical power. This emergency rule establishes a process for [regulated facilities] to obtain sufficient equipment and resources to ensure that the ambient temperature of the [regulated facilities] will be maintained at 80 degrees or less within the facilities for a minimum of ninety-six (96) hours in the event of the loss of electrical power. Prompt implementation of this rule is necessary to ensure continuity of care and to ensure the health, safety, and welfare of residents of Florida's [regulated facilities].

43 Fla. Admin. Reg. 180 (Sept. 18, 2017).

The rules also include identical statements regarding the reason for concluding the procedure used was fair under the circumstances:

The procedure used to adopt this emergency rule is fair, as the State of Florida is under a declaration of emergency due to the massive destruction caused by Hurricane Irma, and it is essential to ensure as soon as possible that temperatures in [regulated facilities] are maintained at a level providing for the safety of the residents residing therein; provides at least the procedural protection given by other statutes, the State Constitution, or the United States Constitution; and takes only the action necessary to protect the public interest under the emergency procedure.

43 Fla. Admin. Reg. 180 (Sept. 18, 2017)

4

Given the limited nature of our review, we conclude the reasons given by the agencies are compliant with the standards set forth in section 120.54(4). The factually explicit emergency rules are persuasive and are sufficient to show an immediate danger to the public health, safety, or welfare. Accordingly, the petitions for review are DENIED.

JAY, J., concurs; WOLF, J., dissents with opinion.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

WOLF, J., dissenting.

In light of the tragedy that took 8 lives at the Rehabilitation Center at Hollywood Hills in September 2017, the State of Florida was justified in taking immediate action against the facility that failed to provide for the safety of its residents. *See Rehab. Ctr. at Hollywood Hills v. Agency for Health Care Admin.*, 43 Fla. L. Weekly D1377 (Fla. 1st DCA June 20, 2018) (upholding emergency suspension of the facility's license). Remedial action, including requiring installation of generators and fuel to operate the generators for 96 hours in all nursing homes and assisted living facilities in the state, is certainly a reasonable action if done in a manner that is fundamentally fair.[1]

The agency, however, implemented this generator policy through emergency rules requiring compliance within 60 days. In order to guarantee due process for parties effected by the rules, there are very specific statutory requirements concerning the contents of an emergency rule. *See* § 120.54(4), Fla. Stat. (2017). The emergency rules in this case, however, did not sufficiently

———————————

[1] For instance, see Rules 58A-5.036 and 59A-4.1265 of the Florida Administrative Code, which were adopted through the regular rulemaking process.

5

demonstrate that the substantial expenditures required within a short period of time were "necessitated by [an] immediate danger" and that the adoption process "was fair under the circumstances," which are two of the required elements for a legitimate emergency rule. *See* § 120.54(4)(a), Fla. Stat. In light of the short time period, substantial expense, and logistical problems involved with complying, these failures require reversal of the emergency rules.

In fact, these emergency rules were ultimately declared to be invalid based on these deficiencies after a post-adoption administrative hearing. *Fla. Ass'n of Homes & Servs. for the Aging, Inc., v. Agency for Health Care Admin.*, Case No. 17-005388RE (DOAH Oct. 27, 2017). While this court did not have the benefit of this order at the time of our original decision and it cannot be used as precedent in this case, the findings of that order are instructive. As will be explained later in this opinion, the order declaring the emergency rules to be invalid demonstrates the reason for the court's obligation to carefully scrutinize emergency rules to determine whether there has been a demonstration of fairness in the adoption process.

FACTS

Both emergency rules contain specific requirements for the installation and maintenance of generators. Rule 59AER17-1 pertains to nursing homes and requires:

> (1) . . . .

> (a) The acquisition of a sufficient generator or sufficient generators to ensure that current licensees of nursing homes will be equipped to ensure ambient temperatures will be maintained at 80 degrees or less for a period of a minimum of ninety-six (96) hours in the event of the loss of electrical power.

> (b) The acquisition and safe maintenance of sufficient fuel to ensure that in an emergency situation the generators can function to maintain ambient temperatures at 80 degrees or less for a period of a minimum of ninety-six (96) hours in the event of the loss of electrical power.

6

(c) The acquisition of services necessary to install, maintain, and test the equipment and its functions to ensure the safe and sufficient operation of the generator system installed in the nursing home.

(2) Each nursing home shall, within sixty (60) days of the effective date of this rule, have implemented the plan required under this rule.

. . . .

(9) The Agency for Health Care Administration may revoke the nursing home's license for failure to comply with this rule.

(10) In addition to other remedies provided by law, violation of this rule shall result in a fine or sanction of $ 1,000 per day.

. . . .

Emergency Rule 59AER17-1, 43 Fla. Admin. Reg. 180 4004 (Sept. 18, 2017); *see also* Emergency Rule 58AER17-1, 43 Fla. Admin. Reg. 180 at 4002 (Sept. 18, 2017) (imposing the same requirements on assisted living facilities).

In sum, the rules required acquisition of a generator and acquisition and retention of sufficient fuel to power the generator for 96 hours within 60 days, which would have been November 15, 2017. Failure to comply may result in the revocation of a license or a fine of $1,000 a day. *See* Emergency Rules 58AER17-1(9)-(10) and 59AER17-1(9)-(10), 43 Fla. Admin. Reg. 180 at 4002-4004 (Sept. 18, 2017).

The agency's statement explaining its reasons for concluding the procedure it used was fair under the circumstances, which is required by section 120.54(4)(a), stated:

The procedure used to adopt this emergency rule is fair, as the State of Florida is under a declaration of emergency due to the massive destruction caused by Hurricane Irma, and it is essential to ensure as soon as

7

possible that temperatures in [regulated facilities] are maintained at a level providing for the safety of the residents residing therein; provides at least the procedural protection given by other statutes, the State Constitution, or the United States Constitution; and takes only the action necessary to protect the public interest under the emergency procedure.

43 Fla. Amin. Reg. 180 at 4002, 4004 (Sept. 18, 2017).

ANALYSIS

Section 120.54(4)(a) provides an agency with the authority to adopt an emergency rule if it "finds that an immediate danger to the public health, safety, or welfare requires emergency action," and such rule is "necessitated by the immediate danger." The agency may adopt an emergency rule by any procedure that is fair under the circumstances, so long as:

> 1. The procedure provides at least the procedural protection given by other statutes, the State Constitution, or the United States Constitution;
>
> 2. The agency takes only that action necessary to protect the public interest under the emergency procedure; and
>
> 3. The agency publishes in writing at the time of, or prior to, its action the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare *and its reasons for concluding that the procedure used is fair under the circumstances.*

§ 120.54(4)(a), Fla. Stat. (emphasis added).

In order to utilize emergency rulemaking, an agency must express reasons at the time of promulgation of the rule for finding a genuine emergency. *Fla. Health Care Ass'n. v. Agency for Health Care Admin.,* 734 So. 2d 1052, 1053 (Fla. 1st DCA 1998).

Here, the agencies failed to express the reasons demonstrating that emergency rules were necessary or that the

8

procedure was fair under the circumstances. Significantly, the emergency rules in this case do not address the following:

(1) Number of facilities effected by the proposed rules;

(2) The size or type of generators needed to accommodate the requirements of the rules;

(3) The availability and costs of the generators in question;

(4) The type of facilities necessary to accommodate the amount of fuel required to be stored;

(5) The availability of space and materials to accommodate the fuel storage facility;

(6) The local and state licenses and permits required to install the generators and store the amount of fuel involved;

(7) The need to obtain specialized professional services to comply with the rules;

(8) Whether the agency conducted any hearings or workshops or did any research to judge the feasibility of compliance; [2]

(9) The necessity for compliance within 60 days, a period that is too short to file for any kind of administrative hearing, especially in light of the necessity for the facilities to immediately begin the

---

[2] In fact, prior to adoption of the rule, the agencies did not consult with the nursing home or assisted living facility industries on whether compliance was economically or practically feasible. *See Fla. Ass'n of Homes & Servs. for the Aging, Inc., v. Agency for Health Care Admin.*, Case No. 17-005388RE (DOAH Oct. 27, 2017).

purchase and installation of equipment as well as beginning the required permitting requirements;

(10) Why compliance by November 15, 2017, was necessary to prevent an ongoing immediate danger since the rules would only be in effect for the last 15 days of hurricane season, which ended on November 30.

Normally when agencies demonstrate on the face of emergency orders that an immediate danger requires immediate action, economic impact statements and feasibility evaluations are not required. Under the unique circumstances of this case, however, where the rule contains little or no justification for the short time period allowed for compliance, the failure to address the obvious complexity and cost of compliance, and the failure of the order to contain any statement that the agency did anything to assure that compliance was feasible, the mere conclusory statement that the procedure was fair under the circumstances was legally insufficient.

The majority correctly states that review of an emergency rule is limited to the face of the emergency order. *See Commercial Consultants Corp. v. Dep't of Bus. Regulation, Div. of Fla. Land Sales & Condos.*, 363 So. 2d 1162, 1163-64 (Fla. 1st DCA 1978). This requirement, however, is one placed on the agency writing the regulation to demonstrate within the rule itself the necessity of issuing an emergency rule without the due process protections of the APA. It is not a check on our ability to review the agency's determination of fairness.

The majority also correctly states that we generally do not concern ourselves with the substance of an emergency rule; rather, our concern is whether the agency followed the requirements of section 120.54(4)(a). *Fla. Democratic Party v. Hood*, 884 So. 2d 1148, 1151 (Fla. 1st DCA 2004). Section 120.54(4)(a) requires the agencies to set forth in writing their reasons for finding that an emergency exists and that the procedure utilized to adopt the rule was fair, and on review, we look only to those reasons to determine the rule's validity. *Hood*, 884 So. 2d at 1153.

10

The majority even acknowledges that the agencies must strictly adhere to the requirements set forth in section 120.54 when adopting emergency rules because the emergency rulemaking procedures do not afford parties full due process protections or the protections of economic impact analyses. *See Krajenta v. Div. of Workers' Comp., Dep't of Labor & Emp't Sec.*, 376 So. 2d 1200, 1202 (Fla. 2d DCA 1979) (noting courts have frequently struck down emergency rules that were not adopted in strict compliance with the statute).

The four corners requirement is not to protect an agency from judicial scrutiny. We, thus, have struck numerous emergency orders for what they do not contain (deficiencies). *See, e.g.*, *Fla. Health Care Ass'n.*, 734 So. 2d at 1054 (overturning an emergency order that failed to state facts demonstrating consumers had been misled, and in regard to fairness, failed to consider how the emergency rule would effect "the facility's business, from marketing and standing in the community to staff morale and attitudes toward caregiving").

The rules in this case contain similar deficiencies. In determining whether deficiencies exist, the four corners review rule does not prohibit us from looking at existing statutes, rules, and regulations, nor does it require us to ignore common sense or common knowledge to determine whether the agency has met its strict burden under the statute. For instance, it is common knowledge that hurricane season ends on November 30; the agencies did not justify why compliance by November 15 was necessary to prevent an ongoing immediate danger, since the rules would only be in effect for the last 15 days of hurricane season. They also failed to address whether they considered the fact that compliance would be costly and time consuming based on existing statutes, rules, ordinances, and regulations regarding the installation of generators and fuel tanks.

There was a reason the agencies did not address these factors; they simply did not consider fairness to the regulated parties as demonstrated by findings of fact 45-47 by the administrative law judge who ultimately struck these rules. *Fla. Ass'n of Homes &*

*Servs. for the Aging, Inc., v. Agency for Health Care Admin.*, Case No. 17-005388RE (DOAH Oct. 27, 2017).[3]

The agencies should have addressed these matters within the emergency rules. If they had, the facilities may not have been required to take costly steps to begin compliance, only to have the rules struck down. It was our job to identify these deficiencies in the rules.

I, therefore, would strike the emergency rules.

_____

[3] 45. AHCA did not consult with the nursing home or ALF industries before adopting Emergency Rule 59AER17-01. DOEA did not consult with the ALF industry prior to adopting Emergency Rule 58AER17-1.

46. Before adoption of Emergency Rule 59AER17-1, AHCA did not investigate whether the requirements imposed by the Emergency Rules were a workable solution that could address the alleged emergency described in the preamble to the Emergency Rules.

47. Before adoption of Emergency Rule 58AER17-1, DOEA did not consider whether it was realistic to expect that ALFs could comply with the Emergency Rules' requirements by November 15, 2017. In addition, DOEA had not (a)formulated or procured any estimates regarding the cost of compliance; (b) become aware of the process and timeframe for planning, permitting, procuring, and installing a commercial generator; (c) consulted with any generator suppliers to ascertain whether this increased need for generators could be satisfied by November 15, 2017; (d) consulted with electrical engineers as to whether 60 days was a reasonable amount of time for compliance; and had not (3) consulted fuel tank suppliers to ascertain if the fuel tanks necessary to comply with Emergency Rule 58AER17-1 could be procured by November 15, 2017.

Seann M. Frazier and Marc Ito of Parker, Hudson, Rainer & Dobbs, Tallahassee, for Petitioner.

William H. Roberts of the Agency for Health Care Administration, Tallahassee; and Stefan R. Grow of the Department of Elder Affairs, Tallahassee, for Respondents.